DREW, J.
 

 | ,Lynette Gail Blow was found guilty of two counts of solicitation for murder. La. R.S. 14:28.1. Ordered to serve 15 years at hard labor concurrently on each count, she filed a timely motion to reconsider sentence, which was denied.
 

 She appeals. We affirm in all respects.
 

 FACTS
 

 Shortly after midnight on June 14, 2008, a Shreveport 9-1-1 operator received a frantic call from an hysterical woman claiming someone was in her home. Initially, the operator had difficulty understanding the caller, but eventually she was able to determine that the caller was in Greenwood, Louisiana, at a home on Waterford Drive. The call was transferred to the Greenwood Police Department, whose officers quickly responded to the scene.
 

 One officer made contact with Michael Blow, a bloodied man sitting on a sofa inside the home. The other officer went to the back of the home searching for the 9-1-1 caller, where he made contact with Lynette Blow, defendant, as she was standing in a rear bedroom, screaming, “They might still be in the house.” The officer was able to get the defendant’s attention and assist her in climbing out of the bedroom window. Meanwhile, the other officer was able to get Mr. Blow to unlock the front door. Mr. Blow was transported to LSU Hospital, where he was treated for shotgun wounds to his hip and back area.
 

 Nothing had been taken, and the ransacked parts of the home appeared to have been staged. The victim had been telling others that he |2believed his wife would attempt to kill him. The detectives subsequently found two men who testified that Mrs. Blow asked them to kill her husband or arrange the contract killing of him.
 

 The defendant had an extramarital affair with Edward Glover in 2004 when she asked him if he or someone he knew would kill her husband for $10,000. Glover responded in the negative, and the defendant broke off contact with him.
 

 In 2007, she made the exact same monetary proposal to a former coworker, when she asked him to find someone to kill Mr. Blow.
 

 DISCUSSION
 

 I. Sufficiency
 

 Law
 

 The defendant argues that the state presented insufficient evidence to validly convict her of the offenses, as there was testimony from only one fact witness in connection with each crime. We disagree. The evidence was overwhelming. Our law on review for sufficiency of the evidence is well settled.
 
 [1]
 

 
 *738
 
 |aLa. R.S. 14:28.1, solicitation for murder, provides:
 

 Solicitation for murder is the intentional solicitation by one person of another to commit or cause to be committed a first or second degree murder.
 

 La. R.S. 14:10, criminal intent, provides:
 

 Criminal intent may be specific or general:
 

 (1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
 

 |4(2) General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.
 

 La. R.S. 14:11. Criminal intent; how expressed
 

 
 *739
 
 The definitions of some crimes require a specific criminal intent, while in others no intent is required. Some crimes consist merely of criminal negligence that produces criminal consequences. However, in the absence of qualifying provisions, the terms “intent” and “intentional” have reference to “general criminal intent.”
 

 Testimony
 

 1. Officer Adam Scheen, now of the Shreveport Police Department, was working for the Greenwood Police Department on June 14, 2008. He was the first officer to respond to the call of a burglary in progress at 7464 Waterwood Drive in Greenwood. He estimated it took him less than a minute to get to the residence, and he passed no cars on the way.
 

 He parked his vehicle and moved toward the home, taking cover behind a tree in the yard, at which time Officer Eaken arrived. Scheen directed Eaken toward the back of the house to look for the victim. Eaken made contact with the defendant, who gave her husband’s name and a description of his clothing.
 

 Once Scheen confirmed the person inside the home to be Mr. Blow, he yelled for the man to identify himself; he did so. Scheen told him the door was locked and he needed to get inside. Mr. Blow was quite bloody, but was able to crawl to the door and open it. Mr. Blow told Scheen that there had been two people in the home, but that he did not know if they were still present. Scheen radioed for a fire department EMT, and called for | ¿additional assistance at the scene. Scheen never spoke with the defendant that night, as she remained in the back with Eaken. Once sheriffs deputies arrived, Scheen turned the scene over to them.
 

 2. Greenwood Police Department Officer Barry Eaken testified he was at the office working on a report when he answered a call from the Shreveport Police Department dispatch who had received the defendant’s 9-1-1 call. He was the second officer to arrive. He parked at the end of the yard and approached the home. During the short trip to the scene, he was in constant contact with the dispatcher and Scheen. As he approached the home, he saw a bloody man sitting inside on a couch.
 

 Eaken walked around the house, peering through the windows. He found an open gate and moved toward the back of the home searching for the caller. Noticing a dim light in a bedroom, Eaken shined his flashlight into the window and identified himself. The defendant was standing inside and was on the phone.
 

 Eaken told the jury that he wore a video-audio recorder on the night he responded to the scene and the recording was preserved and turned over as evidence in the case. The recording was played for the jury.
 

 The defendant’s demeanor seemed unusual to Eaken, in that she seemed surprised that the victim was reported to be sitting on the couch. She would get very excited and hysterical and then become calm for a period. Eaken recalled that the defendant appeared to be crying at times, though he saw no tears. The defendant’s cries, according to Eaken, were contrived. He helped her out through a window.
 

 | ¿Eaken acknowledged the fact that the defendant asked “quite a few” times about the victim’s condition. As Eaken’s video recording was played for the jury again, Eaken stated he did hear the defendant say “thank God” in response to being informed that the victim was sitting on the couch after the shooting. The defendant also responded “good, good” after being told that the victim was conscious and
 
 *740
 
 talking. Based on the recording, Eaken testified that the defendant seemed concerned about the victim’s condition. After inquiries about her husband, she mentioned her leg burning, showing Eaken some white powder on her pants leg.
 

 3. Sergeant Stacy Poarch of the Greenwood Police Department testified she was working dispatch on the night of the shooting and answered a call from the Shreveport Police Department. This was the second call, as the first call had been disconnected. During this second call, Poarch could hear the caller (defendant) screaming, calling for help, and advising that when she and her husband returned home and turned on a light, two men attacked her husband. The caller also said she ran into her daughter’s bedroom and locked herself in a closet. This second call was disconnected as well, and Poarch was given the number by “Shreveport” so she called the defendant back. During this conversation, Poarch instructed the defendant to remain in the closet where she was hiding for safety reasons. Poarch recalled that the defendant told her that two men were still inside the house. Calls to the Greenwood Police Department were not recorded. The 9-1-1 tape from the Shreveport Police Department was introduced into evidence.
 

 |74. James Sarrett, a fireman/EMT with Fire District 3, responded to the call of a home invasion at the defendant’s residence and found the victim outside the home. He examined the defendant, because she was hysterical, anxious and hyperventilating, but not crying. After she calmed, she told him that when she and her husband came home, they entered through the garage door. Someone brushed against her and she heard a struggle, then she ran to the back bedroom of the house, where she locked the door, got into a closet, and called 9-1-1. Sarrett found the defendant’s reactions to be strange, though he was treating her, not questioning her.
 

 5. Sergeant Gary Baird, a crime scene investigator with the Caddo Parish Sheriffs Office, was accepted by the court as an expert in crime scene processing. Baird photographed the crime scene, and he identified those photographs during his testimony.
 

 One photo depicted a broken window, about which Baird concluded that, to have been a point of entry, it would have had to have been opened. Even though some panes had been broken from the outside, cobwebs and debris found on the inside and outside of the window convinced him that it had not been opened, a necessary predicate for a person to have entered in this way on the evening in question.
 

 Baird photographed a cordless telephone on the bed in a bedroom. The last number dialed was 9 — 1—1, and the line was still open. The officer found undisturbed laptop computers, video game equipment, and stereo equipment, though the master bedroom had been ransacked. He photographed shotgun blast damage to a wall; he agreed that a shotgun is 18not a typical weapon for a home invasion or robbery. He prepared several diagrams of the crime scene. Baird agreed that it was possible the white powdery substance found on the defendant’s pants could have been deposited there as a result of damage to the Sheetrock, and that she could have been standing in front of the shotgun blast, though he discounted the possibility that any alleged burning on defendant’s leg could have been caused by any contact with the shotgun.
 

 6. Zachary Rougon, a Greenwood firefighter, testified that he responded to the call for assistance at the defendant’s residence after hearing of the home invasion on the radio while at the station. When he
 
 *741
 
 and his partner arrived on the scene, he found a male lying in the doorway of the home. They took the victim to the ambulance to check him for injuries and found he had a shotgun wound to his shoulder area. Mr. Blow was transported to LSU hospital, where another shotgun wound, to the left hip, was found. The victim was not able to give any details other than to say, “Two men,” when asked what had happened.
 

 7. Sandra Poole, a neighbor, testified she had gone to bed right after midnight. She thought someone might have driven into her driveway, because some car lights seemed so close. She saw nothing out the window, though she heard a loud noise, then saw red lights
 
 [2]
 
 illuminating the Blows’ back yard. Soon there was another loud noise, after which a car sped away. She recalled the vehicle to be a light colored, small to medium sedan, which sped away through a gate.
 

 |flShe said that the entire incident lasted 15 minutes or less. She did not hear any noises like breaking glass or voices. After the car fled, lights were turned on in the house, and a few minutes later, police and paramedics started to arrive. She admitted that she had been drifting off to sleep when she saw the lights in her window and could not be certain of the exact time frame of events.
 

 8. Corporal Jeff Thomas of the Caddo Parish Sheriffs Office was qualified as an expert in crime scene processing. Thomas assisted Sgt. Baird, the primary investigator, with collecting evidence and processing the scene for latent prints, none of which matched any suspect. Thomas also collected blood samples from the scene for possible DNA testing; however, the samples were not tested or analyzed. As a part of his tasks in processing the scene, Thomas photographed a closet where firearms were hidden behind some clothing. He noted that the guns did not appear to have been recently disturbed as they were covered with dust. He was unable to locate any shotgun shells in the closet.
 

 Thomas photographed and collected a black purse and wallet from the backyard of the house. The contents of the purse included the defendant’s driver’s license, gift card, and other miscellaneous pieces of paper, but no currency.
 

 9.Michael Blow, the victim, testified that he lived in Shreveport most of his life. After completing college, he worked for Pennzoil refinery as an electrician for 26 years. He has one son from a prior marriage.
 

 | mPrior to meeting the defendant, Mr. Blow and a friend purchased a laundry business. The partner later sold the business to Mr. Blow, and the enterprise has grown through the years to add cleaners and several drop-off locations.
 

 Mr. Blow testified that:
 

 • he met the defendant through a mutual friend in 1997;
 

 • they were married within a few months;
 

 • she and her children moved in with him;
 

 • about two years later, they purchased their home in Greenwood;
 

 • though the cleaning business was increasing, they went into the real estate business, purchasing rental properties for her to manage;
 

 • he had a good relationship with her children and provided for them;
 

 • until 2004, he thought everything was well in the marriage;
 

 
 *742
 
 • that year, however, Mrs. Blow unexpectedly left the family home, taking most of their furnishings and a new car;
 

 • he was mystified about her departure, and he wanted to reconcile;
 

 • after marriage counseling, they reconciled, and the defendant returned;
 

 • while separated, he heard that the defendant was having an affair and had been telling someone she wished him dead;
 

 • he was hurt by the information, but he decided to ignore it, thinking that people could be cruel and the rumor was probably untrue;
 

 • he never mentioned this to anyone, including the defendant, because he did not want to further disrupt their relationship;
 

 • a fellow motorcycle club member, Don Stone, told him in 2004 of the rumor that she wanted to have him killed, a rumor he chose not to believe;
 

 | ,,• after she came home around Christmas of 2004, their relationship seemed back on track until 2006, when he thought she began having an affair;
 

 • that year, she began getting unexplained telephone calls at odd times;
 

 • when he confronted her, they argued, then when he was almost asleep, the police came, indicating that they were there on a domestic disturbance call;
 

 • the police told them that one of them would have to leave;
 

 • he wouldn’t, so she did;
 

 • in 2007, his suspicions about her adulterous activities began to increase;
 

 • in early 2008, they argued about him adopting Ashley, her daughter, which he considered unnecessary as he had already given her his name;
 

 • he later denied her request to put the business in her name, angering her;
 

 • she also started inquiring about his financial situation;
 

 • on Memorial Day weekend of 2008, he went to his lake house in Murvaul, Texas, while she supposedly went to Dallas on a shopping trip;
 

 • after they returned home, she went to the store, whereupon he looked through her text messages, which confirmed his suspicions about her infidelity;
 

 • about this time, one of his longtime employees, Patricia Williams, told him that the defendant had approached a customer about killing or finding someone to kill him, which was the second time he had heard this rumor;
 

 • he contacted his cousin who worked for the Shreveport Police Department and discussed the situation;
 

 • to acquire proof of her plans, he hired a private investigator, William Ray;
 

 • he also went back to Don Stone, who had become his good friend, to find out more information about the first allegation that she wanted him dead; and
 

 11⅞* Stone now referred him to Spencer Combs, who then freely discussed with him the details of Mrs. Blow’s 2004 request to have Mr. Blow killed.
 

 10. Stacey Johnson, a fraud investigator with the Department of Social Service, Office of Family Support, testified that the defendant had fraudulently received $22,527 in food stamps from September of 2002 until May of 2008.
 

 11. Wayne McKinney testified that:
 

 • he was a friend of the defendant, who had worked with him for the city;
 

 • he met Michael Blow when he frequented his Laundromat;
 

 • his relationship with Mr. Blow was casual;
 

 
 *743
 
 • he was in Baton Rouge, attending a convention, when several people told him he needed to contact people in Shreveport about a shooting;
 

 • since he thought it concerned another shooting, he did nothing;
 

 • when he got home, a deputy asked if he knew Michael and Lynette Blow;
 

 • the deputy said that Mr. Blow had been shot and was in critical condition;
 

 • his reaction was, “My god, she really did it, huh?”;
 

 • the defendant told him in 2007 that she wanted him to find somebody to kill Mr. Blow, and she would pay $10,000 to have it done;
 

 • he told Mr. Blow about it at the time, eliciting no response;
 

 • he later saw the Blows looking happy together, so he dropped the subject;
 

 • he never had any intentions of assisting the defendant with her request;
 

 • he reported the conversation to a detective, figuring he was done with it;
 

 ha* she did not ask him to kill the victim, but to find someone to do so;
 

 • he never saw the couple angry with each other anytime afterwards;
 

 • she never pursued him again with the request;
 

 • he acknowledged he drank daily; and
 

 • he took it seriously enough to report it to the police.
 

 12. Edward Glover testified he met the defendant sometime in 2008 or 2004 at a carwash, at which time they exchanged numbers. They spoke on the phone a few days later, then had sex at her apartment on Rasberry Lane in Shreveport. Their relationship was purely sexual in nature, and they never dated or did any other activities together. The two got together between five and ten times, either at the apartment or at other places. The relationship lasted a couple of months.
 

 On one occasion, she told Glover that if she could get rid of her husband she could have it all. She said she would pay someone to handle it. He did not believe the defendant was serious, and he was not sure that the defendant had a husband because he had not seen any pictures or anything in the house that would indicate she was married. Glover did mention the incident to his cousin, Carlos Johnson, who was also Spencer Combs’ brother-in-law. Glover testified his last meeting with the defendant occurred in Cargill Park, which was near the apartment complex where Glover worked. She told him that they would have to stop seeing each other because he could not do anything for her. He could not pin down the date of her offer, other than 2003 or 2004, and he never referred her to others.
 

 |1413. Elizabeth White, a retired certified nurse’s assistant, and a 30-year friend of the defendant, testified that she learned of the shooting from Mrs. Blow, who called her from the hospital, sounding hysterical. White thought that Mrs. Blow was in shock that night. On the phone days later, Mrs. Blow was slurring her words, acting strangely, and answering questions inappropriately.
 

 A few days later, Ms. White noticed that Mrs. Blow had lost some weight. As they hugged, they both began to cry.
 

 Ms. White stated she was not aware of any marital problems between the Blows, and she believed Mrs. Blow would have shared that information with her if there had been. She had never told Ms. White anything about wanting to hurt Mr. Blow, and she was a good friend and a good person.
 

 14. Lynn Phelps, the defendant’s ex-husband, testified that he and the defen
 
 *744
 
 dant had been married from 1981 to 1984, and their financial situation was very good during the marriage. Mr. Phelps stated the defendant was a good mother to his daughter, whose biological mother died when the child was four years old. He classified the divorce as friendly, with no disputes over furniture or finances.
 

 There were no threats of violence during his divorce, and he had not spoken with defendant for five years, and he did not have any reason to lie for her in court.
 

 Phelps had never heard that the defendant was interested in hiring someone to kill Mr. Blow. Though he did know Wayne McKinney, he denied ever having a conversation with him about the defendant’s attempt to |15find someone to hurt Mr. Blow. He never considered defendant to be a violent person who would go to the extent of causing physical harm or causing someone’s death.
 

 15. Tammy Phelps, the defendant’s stepdaughter from her marriage to Lynn Phelps, testified on the defendant’s behalf, indicating that she and the defendant were very close during the marriage to her father. After the divorce, during her teen years, she didn’t talk to the defendant much. During college, she and the defendant again developed a close relationship. Mrs. Blow had never told her that she wanted to hurt Mr. Blow or have him hurt. Had she done so, she would have contacted the police with this information because it would have scared her.
 

 She always admired the Blows as a couple and as grandparents and extended family to her children. Mr. Blow always cared for the defendant and the family.
 

 She knew that the Blows had a flawed, yet happy, relationship.
 

 16. Michael Phelps, the defendant’s son, testified that he was in school in Dallas, but was home visiting, going to the movies, when Mr. Blow was shot. When he saw his mother at the hospital, she appeared to be in her own world sitting in the waiting room. He thought she was in shock.
 

 Never had he seen the two physically fight during their marriage, nor had he heard the defendant threaten Mr. Blow. He saw nothing in the Blows’ relationship that would have indicated they were planning to divorce.
 

 11617. Michael Lee, the defendant’s brother, testified that he was in the Wild Bunch motorcycle club with Mr. Blow from 2003 to 2005. The club took a trip to Dallas in 2005 and were eating in a restaurant when a group of ladies joined them, apparently having been called by Mr. Blow. Lee worked at the Blows’ cleaners from 2002 through 2005 and observed the marital situation as appropriate. Since leaving employment at the cleaners, Lee had spent time with the Blows at various functions, at their home, and traveling to their new boathouse to spend the weekend.
 

 Lee had no indication that the Blows were thinking about divorcing, and he thought he would have known. After the shooting, Lee thought the defendant appeared disturbed, shaken up and mentally confused. She lost weight during Mr. Blow’s convalescence, and for several weeks did not appear to be herself. She had never told him that she wanted to hurt Mr. Blow or have someone hurt him.
 

 18. Ashley Blow, the defendant’s daughter, testified she was young when her mother married Mr. Blow, and she considered him to be her daddy. On the night he was shot, Ashley had gone to the movies with her brother and his friend.
 

 When they arrived home, Ashley could see police lights, fire trucks, and an ambulance near the house, which greatly upset her. When Ashley saw her mother at the
 
 *745
 
 hospital, she looked devastated, worried, and was acting abnormally.
 

 Her mother spent much time at the hospital, sleeping very little, not eating much and losing weight the week following the shooting.
 

 117Ashley recalled a brief split-up in 2003 or 2004, but she never saw any change in the Blows’ relationship in the months before the shooting. She believed her mother would have told her if she had planned to leave Mr. Blow. She never heard her mother talk about wanting to hurt Mr. Blow in any way.
 

 19. Vicki Ary, the defendant’s sister, testified she received a call the night of the shooting and was told she needed to come to the house, where they saw the defendant in the back of the ambulance. A nurse, she noticed that Mrs. Blow appeared very shaken and was hyperventilating and drooling. Mrs. Blow did not complete any sentences with a detective at the scene. Mrs. Ary and her sister went directly to the hospital to check on Mr. Blow. She said it took a week after the shooting before Mrs. Blow got back to normal. The defendant remained at the hospital most of the time, and did not appear to be concerned about her own health.
 

 Mrs. Ary knew of no marital problems between the Blows, and she believed Mrs. Blow would have discussed with her any plans to leave Mr. Blow. Mrs. Blow never told her about wanting to hurt Mr. Blow or wanting to have someone hurt him. Mrs. Ary admitted not knowing of the defendant’s extramarital affairs but she did not believe the affairs would indicate a divorce was imminent.
 

 Analysis
 

 The charges were proven. The testimonies of Edwin Glover and Wayne McKinney were apparently believed, and were sufficient to support the convictions.
 

 11sMcKinney testified Mrs. Blow told him she had big problems and needed assistance. According to McKinney, Mrs. Blow stated that she needed to find someone to kill her husband. Mrs. Blow indicated she would pay $5,000 in advance and $5,000 once the murder was completed. The jury accepted McKinney’s testimony as truthful. His testimony presented no internal contradiction or irreconcilable conflict with physical evidence; thus that testimony, if believed by the trier of fact, was sufficient support for the requisite factual conclusion that Mrs. Blow was guilty of the charged offense.
 

 Similarly, the testimony of Glover was sufficient to establish the essential elements of the second count of the bill of information. He testified that he began a two-month sexual affair with Mrs. Blow in 2004. For $10,000, she told him that she wanted her husband dead, stressing that she did not like living on an allowance.
 

 Mrs. Blow argues on appeal, for the first time, that the state failed to prove Count One, that she solicited Wayne McKinney to commit first or second degree murder of her husband. Her somewhat specious position now is that there was no evidence that anyone asked him to kill her husband, only to find someone to kill him. The defendant supports this claim by pointing out the difference in the language of each count, in that Count Two charges that she did solicit Edward Dewayne Glover to commit
 
 or cause to be committed
 
 a first or second degree murder of her husband.
 

 | iaHad McKinney complied with her request, they both would have faced first degree murder. Requesting this result satisfies the elements of La. R.S. 14:28.1.
 

 We can discern no appreciable legal difference in asking a person to kill her
 
 *746
 
 husband, as opposed to asking a person to find someone to kill her husband. Under either scenario, this woman committed solicitation for murder.
 

 While the defendant’s witnesses testified that she appeared to be in shock for days following the shooting, the video of her statements was contrary to these assertions. She was calm and responded appropriately to questioning by the police. She appeared to be very calculated in her responses, showing little reaction when accused of being involved in her husband’s shooting.
 

 II. Wrongfully Admitted 404 B Evidence
 

 The defendant argues that testimony and evidence demonstrating other crimes or prior bad acts was erroneously admitted by the trial judge, and because it cannot be determined that the verdicts were not attributable to the erroneously admitted evidence, the defendant is entitled to a new trial. She argues that the evidence of the food stamp fraud case was not relevant, admissible, or probative because it was not evidence of a similar but disconnected crime relative to the solicitation for murder.
 

 The state responds that the other crimes evidence was properly admitted as it established the defendant’s greedy motivation for the charged crimes and lack of affection for her husband.
 

 12f)The state suggests that if this court finds that the other crimes evidence was erroneously admitted, the error would be subject to the harmless error review. Under this review, the state contends the testimony of witnesses Glover and McKinney was sufficient to convict the defendant of the charged offenses.
 
 [3]
 

 The defendant argues that a general motive of greed and lack of affection is insufficient to support the admission of 404 B evidence. Additionally, she argues that the state failed to show, in brief or at trial, how evidence of the food stamp fraud could be evidence of her lack of affection for her husband or her intent and willingness to have him murdered.
 

 Our law on the admissibility of other crimes is well settled.
 
 [4]
 

 
 *747
 
 12|The state filed two notices of intent to introduce other crimes, wrongs, or acts committed by the defendant. The first notice provided seven acts which were related to the shooting of Michael Blow. The second notice provided that evidence of the defendant’s previous attempt to poison her husband would be introduced. The defendant objected by filing a motion in limine seeking a determination of the admissibility of this evidence. Prior to the start of the trial, a hearing was conducted pursuant to the defendant’s motion.
 

 122At the hearing, the state argued that it needed to present the 404 B evidence to prove the element of specific intent rela-five to the 2004 and 2007 solicitations. The defendant’s involvement in and orchestration of the 2008 shooting would show that the defendant was serious about the earlier events. The state further argued that the events would show a continuous narrative of the investigation as the charged offenses were discovered only as a result of the investigation of the 2008 event, which is an integral part of the state’s case.
 

 The learned trial judge specifically questioned the state’s submission that related to the defendant’s extramarital affairs. In response, the state argued that the evidence went directly to both the motive, in
 
 *748
 
 wanting to be free from the marriage, and intent of the crime, in that the defendant, during the investigation of the 2008 shooting, placed her credibility at issue when she provided statements regarding the stability of her marriage and her affection for her husband while she was involved in two extramarital sexual liaisons in the weeks prior to the 2008 shooting.
 

 The defendant responded that any evidence of affairs committed in 2008 would not go to proving that she committed the crimes but simply to show she was a bad person, which was not the intent of 404 B evidence. The defendant argued that there was no evidence to connect her to the 2008 shooting and the state was only attempting to “coattail” the shooting with the 2004 and 2007 events to bolster its case. She also noted that evidence of fights over finances would establish only that she was a bad person.
 

 |?JiThe trial court ruled that all of the 404 B evidence was admissible, being relevant to the basic inquiry of the court, and because its probative was not outweighed by its prejudicial effect.
 

 The state showed by clear and convincing evidence that she committed the proffered acts, including her involvement in the 2008 shooting. With one exception, the state also demonstrated that the acts committed by the defendant furthered her chilling motive to be free from her marriage by having someone kill her husband. Also, with one exception, this evidence was relevant, probative, necessary to prove the case, and clearly not outweighed by its prejudicial effect.
 

 The exception to this finding is the relatively minor food stamp issue, which could show little, if anything, about her marital relationship. It bespoke only her general greedy nature. In hindsight, the food stamp evidence was admitted in error, but we find that the verdict was unattributable to this error.
 

 III. Excessiveness
 

 The defendant argues that because the evidence adduced at trial was insufficient to convict her of the charged offenses, the sentences imposed are excessive. She submits the sentences should be reduced to two five-year concurrent sentences, and that at least a portion of the sentences should be suspended. The sentences would be appropriate, according to the defendant, based on her lack of criminal history; her personal, social, and work history; her daughter’s diagnosis with multiple sclerosis; her potential for rehabilitation and the “future positive contributions” to her family, ^neighborhood, associates, and the city; the seriousness of the offense in comparison with similar crimes; and the existence of reasonable doubt in the case as evidenced by the jury’s non-unanimous verdict.
 

 The state argues that the defendant’s sentences are not excessive, but are appropriate here, because of defendant’s “heinous, calculated, and degenerate conduct” towards her husband.
 

 In a reply brief, the defendant contends the record establishes the fact that the district court failed to consider her personal history, her lack of prior criminal record, and the likelihood of her rehabilitation in determining the sentence. The defendant also argues that the state and the trial court relied too heavily on the 2008 shooting, which did not directly connect her to the incident, to justify the imposed sentence. The defendant indicates her sentences should be substantially lowered if this court does not acquit her or order a new trial.
 

 
 *749
 
 Our law on the review of sentences is well settled.
 
 [5]
 

 | ⅞⅞Whoever commits the crime of solicitation for murder shall be imprisoned at hard labor for not less than five years nor more than twenty years. La. R.S. 14:28.1.
 

 After the denial of her motion for new trial and motion for post verdict judgment of acquittal, the defendant waived delays, and a sentencing hearing was held, where she presented three witnesses.
 

 Vicki Ary, Mrs. Blow’s older sister, testified that her sister’s incarceration had a very devastating effect on the family because they relied on her for a lot of emotional and physical care for their parents. Mrs. Blow’s children were likewise devastated as they lacked the financial support that they had been accustomed to receiving and had to move from their home. Additionally, Mrs. Blow’s daughter, Ashley, had been recently |2fidiagnosed with
 
 *750
 
 multiple sclerosis. Mrs. Ary did not believe she committed these crimes because she was kind and loving.
 

 Ashley Blow, defendant’s daughter, testified that her mother was her best friend, and her support had been taken away at a time when Ashley needed her because of her recent MS diagnosis. Ashley believed her family had been happy prior to the shooting, and did not think her mother would harm the victim.
 

 Mrs. Blow testified at the sentencing hearing, accentuating her involvement in the care of her parents, one with a heart condition and the other a diabetic. She also discussed her life with her children and the victim indicating that her family was “perfect.” She noted that she and the victim were involved in the life of her ex-husband’s daughter, as well as her child.
 

 She discussed her prior marriage as well as her work history before and during her marriage to the victim, acknowledging her pending food stamp fraud charge, but noting that she had no other felony charges. She denied asking anyone to kill or hurt her husband. She rarely talked to the witnesses who alleged she committed the crimes. The defendant stated, “I have never done anything to hurt Michael Blow or any other human. It’s not in my nature. I’m a soft, gentle person. I wouldn’t hurt anyone. I have never asked those men anything like that.”
 

 She denied having sexual relations with Glover at her place of business, further claiming that she was actually raped by him. She admitted sexual relationships with four other men and justified these actions by saying her husband neglected her. She testified that she had sex with each 127man only one time and any testimony to the contrary by them would have been a lie. Even though she said she had decided not to continue any of these illicit relationships, knowing they were mistakes, she was still engaging in the affairs two weeks before the shooting.
 

 Mrs. Blow admitted mistakes, but said she never wanted to hurt the victim or any other person. She denied arguing with Mr. Blow regarding finances or any other issues, claiming instead that Mr. Blow lied during his testimony about that issue. She agreed that he had provided well for herself, her children, and her parents.
 

 There is sufficient evidence in the record to determine that the factors of La. C. Cr. P. art. 894.1 were considered. The trial court noted that the presentence investigation (PSI) prepared in the case was being circulated between the parties. The PSI throughly reported Mrs. Blow’s work history, familial relationships, and employment records. It included a statement from Michael Blow, regarding the impact of the crimes on his life as well as his feelings toward the defendant.
 

 Prior to imposing sentence, the trial court noted the factual basis for imposing the sentence. The court indicated that the facts established at trial showed that the defendant, on two occasions, contacted male acquaintances about having her husband murdered. The trial judge also noted that he considered the other crimes evidence relative to the 2008 shooting, finding defendant’s explanation incredible.
 

 On the second prong of the excessiveness test, there is no showing that the defendant’s sentence is excessive. She has failed to show that the ^sentences imposed by the trial judge are constitutionally excessive. Considering this record, these 15-year concurrent sentences are not out of proportion to the seriousness of the offenses. Mrs. Blow’s exposure was up to 40 years at hard labor. Additionally, it cannot be said that these midrange sentences inflict purposeless and needless pain and suffering.
 
 See State v. Smith,
 
 
 *751
 
 2001-2574 (La.1/14/03), 839 So.2d 1. The sentences cannot be considered to be grossly disproportionate to these cold crimes. The trial court did not abuse its sentencing authority in imposing these sentences.
 

 IY. Nonunanimous Verdict
 

 Mrs. Blow somehow conjures up a structural defect here, in that the jury reached a 10-2 verdict in less than two hours. She views this split verdict and its alacrity as reflecting less than ample consideration of the case. The quick verdicts could more likely be ascribed to the overwhelming nature of the evidence.
 

 La. Const. Art. I, § 17, provides that a case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of 12 persons, 10 of whom must concur to render a verdict. Almost identically, La. C. Cr. P. art. 782 provides that cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of 12 jurors, 10 of whom must concur to render a verdict. Nonunanimous jury verdicts have consistently been upheld by the courts.
 
 Apodaca v. Oregon,
 
 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972);
 
 Johnson v. Louisiana,
 
 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972);
 
 State v. Bertrand,
 
 2008-2215 (La.3/17/09), 6 So.3d 738.
 

 | ¾/rhe verdicts and sentences meet all constitutional and statutory requirements.
 

 DECREE
 

 The defendant’s convictions and sentences are AFFIRMED.
 

 [1]
 

 . When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under
 
 Hudson v. Louisiana,
 
 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt.
 
 State v. Hearold,
 
 603 So.2d 731 (La.1992);
 
 State v. Bosley,
 
 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347,
 
 writ denied,
 
 97-1203 (La. 10/17/97), 701 So.2d 1333.
 

 The
 
 Jackson
 
 standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to
 
 *738
 
 substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La.App.2d Cir. 1/14/09), 1 So.3d 833,
 
 writ denied,
 
 2009-0310 (La.l 1/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685,
 
 writ denied,
 
 2009-0725 (La. 12/11/09), 23 So.3d 913;
 
 State v. Hill,
 
 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La. 12/14/07), 970 So.2d 529.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Speed,
 
 43,786 (La.App.2d Cir. 1/14/09), 2 So.3d 582,
 
 writ denied,
 
 2009-0372 (La.11/6/09), 21 So.3d 299;
 
 State v. Parker,
 
 42,311 (La.App.2d
 
 Cir.8/15/07), 963
 
 So.2d 497,
 
 writ denied,
 
 2007-2053 (La.3/7/08), 977 So.2d 896.
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v. Gullette,
 
 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753;
 
 State v. Burd,
 
 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219,
 
 writ denied,
 
 2006-1083 (La.11/9/06), 941 So.2d 35.
 

 The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey, 99-0023
 
 (La.1/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
 

 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.
 
 State v. Speed, supra; State v. Allen,
 
 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622,
 
 writs denied,
 
 2002-2595 (La.3/28/03), 840 So.2d 566, and 2002-2997 (La.6/27/03), 847 So.2d 1255,
 
 cert. denied,
 
 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
 

 The
 
 Jackson
 
 standard neither permits a reviewing court to second guess the rational credibility determinations of the fact finder at trial,
 
 State ex rel. Graffagnino v. King,
 
 436 So.2d 559 (La.1983), nor requires a reviewing court to consider the rationality of the thought processes employed by a particular fact finder in reaching a verdict.
 
 State v. Marshall,
 
 2004-3139 (La.11/29/06), 943 So.2d 362,
 
 cert. denied,
 
 552 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007).
 

 [2]
 

 . She later concluded these were brake lights.
 

 [3]
 

 . Particularly when considering the chilling similarities of the $10,000 payment offered to Glover and McKinney.
 

 [4]
 

 . La. C.E. 404 B Other crimes, wrongs, or acts.
 

 (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
 

 (2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim’s prior threats against the accused or the accused’s state of mind as to the victim’s dangerous character is not admissible; provided that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert’s opinion as to the effects of the prior assaultive
 
 *747
 
 acts on the accused's state of mind is admissible.
 

 Generally, evidence of other acts of misconduct is not admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him or her as a "bad person.” La. C.E. art. 404 B(1);
 
 State v. Jackson,
 
 625 So.2d 146 (La. 1993). This rule of exclusion stems from the "substantial risk of grave prejudice to the defendant” from the introduction of evidence regarding his unrelated criminal acts.
 
 State v. Prieur,
 
 277 So.2d 126 (La.1973). However, evidence of other crimes may be admissible if the state establishes an independent and relevant reason,
 
 i.e.,
 
 to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404 B(1);
 
 State v. Roberson,
 
 40,809 (La. App.2d Cir.4/19/06), 929 So.2d 789. Even when the other crimes evidence is offered for a purpose allowed under Article 404, the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defense. The probative value of the extraneous crimes evidence must outweigh its prejudicial effect. La. C.E. art. 403;
 
 State
 
 v.
 
 Jacobs,
 
 1999-0991 (La.5/15/01), 803 So.2d 933,
 
 cert. denied,
 
 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002);
 
 State v. Hatcher,
 
 372 So.2d 1024, 1033 (La.1979).
 

 A trial court’s ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion.
 
 State v. Scales,
 
 93-2003 (La.5/22/95), 655 So.2d 1326,
 
 cert. denied,
 
 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996);
 
 State v. Caston,
 
 43,565 (La.App.2d Cir.9/24/08), 996 So.2d 480;
 
 State v. Cooks,
 
 36,613 (La.App.2d Cir.12/4/02), 833 So.2d 1034.
 

 For evidence of other crimes to be admissible, the state must: 1) prove with clear and convincing evidence that the other acts or crimes occurred and were committed by the defendant; 2) demonstrate that the other acts satisfy one of the requirements of La. C.E. art. 404 B(l),
 
 i.e.,
 
 motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident; and 3) show that the probative value of the evidence outweighs its prejudicial effect.
 
 State v. Jackson, supra.
 

 Evidence of other crimes, wrongs or acts may be introduced when it relates to conduct that forms an integral part of the act or transaction that is the subject of the present proceedings. La. C.E. art. 404 B(1);
 
 State v. Colomb,
 
 98-2813 (La.10/1/99), 747 So.2d 1074;
 
 State v. Coates,
 
 27,287 (La.App.2d Cir.9/27/95), 661 So.2d 571,
 
 writ denied,
 
 95-2613 (La.2/28/96), 668 So.2d 365.
 

 The erroneous introduction of other crimes evidence is subject to harmless error review.
 
 State v. Roberson, supra; State v. Gatti,
 
 39,833 (La.App.2d Cir. 10/13/05), 914 So.2d 74,
 
 writ denied,
 
 2005-2394 (La.4/17/06), 926 So.2d 511;
 
 State v. Salter,
 
 31,633 (La.App.2d Cir.2/24/99), 733 So.2d 58,
 
 writ denied,
 
 1999-0990 (La.9/24/99), 747 So.2d 1114.
 

 [5]
 

 . The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article.
 
 State v. Smith,
 
 433 So.2d 688 (La.1983);
 
 State v. Lathan,
 
 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890,
 
 writ denied,
 
 2007-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1.
 
 State v. Lanclos,
 
 419 So.2d 475 (La.1982);
 
 State v. Swayzer,
 
 43,350 (La. App.2d Cir.8/13/08), 989 So.2d 267,
 
 writ denied,
 
 2008-2697 (La.9/18/09), 17 So.3d 388. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation.
 
 State v. Jones,
 
 398 So.2d 1049 (La.1981);
 
 State v. Ates,
 
 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259,
 
 writ denied,
 
 2008-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing.
 
 State v. Shumaker,
 
 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277,
 
 writ denied,
 
 2007-0144 (La.9/28/07), 964 So.2d 351.
 

 Second, a sentence violates La. Const. Art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering.
 
 State v. Smith,
 
 2001-2574 (La. 1/14/03), 839 So.2d 1;
 
 State
 
 v.
 
 Dorthey,
 
 623 So.2d 1276 (La.1993);
 
 State v. Bonanno,
 
 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice.
 
 State v. Weaver,
 
 2001-0467 (La.1/15/02), 805 So.2d 166;
 
 State v. Lobato,
 
 603 So.2d 739 (La. 1992);
 
 State v. Robinson,
 
 40,983 (La.App.2d Cir. 1/24/07), 948 So.2d 379;
 
 State v. Bradford,
 
 29,519 (La. App.2d Cir.4/2/97), 691 So.2d 864.
 

 In selecting a proper sentence, a trial judge is not limited to considering only a defendant’s prior convictions but may properly review all prior criminal activity.
 
 State
 
 v.
 
 Pamilton,
 
 43,112 (La.App.2d Cir.3/19/08), 979 So.2d 648,
 
 writ denied,
 
 2008-1381 (La.2/13/09), 999 So.2d 1145;
 
 State v. Boyte,
 
 42,763 (La.App.2d Cir. 12/19/07), 973 So.2d 900,
 
 writ denied,
 
 2008-0175 (La.6/20/08), 983 So.2d 1272. The sources of information relied upon by the sentencing court may include evidence usually excluded from the courtroom at the trial of guilt or innocence,
 
 e.g.,
 
 hearsay and arrests, as well as conviction records.
 
 State v. Myles,
 
 94-0217 (La.6/3/94), 638 So.2d 218. These matters may be considered even in the absence of proof the defendant committed the other offenses.
 
 State v. Doyle,
 
 43,438 (La.App.2d Cir.8/13/08), 989 So.2d 864.
 

 There is no proportionality guarantee in noncapital cases unless the reviewing court finds the sentence is grossly disproportionate to the circumstances of the offense. See
 
 Harmelin v. Michigan,
 
 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), in which the Court ruled "the Eighth Amendment contains no proportionality guarantee.”
 
 State v. Callahan,
 
 29,351 (La.App.2d Cir.2/26/97), 690 So.2d 864, fn. 2,
 
 writ denied,
 
 97-0705 (La.9/26/97), 701 So.2d 979.