STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

18-445

STATE OF LOUISIANA

VERSUS

HARLOW HUTCHINSON

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 59587
HONORABLE EDWARD B. BROUSSARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

SYLVIA R. COOKS
JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulyssess Gene Thibodeaux, Chief Judge, Sylvia R. Cooks and
Marc T. Amy, Judges.

AFFIRMED WITH INSTRUCTIONS.

Edward K. Bauman
Louisiana Appellate Project
P.O. Box 1641
Lake Charles, LA  70602
(337) 491-0570
  Attorney for Appellant/Defendant:
   Harlow Hutchinson

Celeste White
Assistant District Attorney
Parish of Vermilion
State of Louisiana
(337) 232-5170
  Attorney for Appellee:
   State of Louisiana

Harlow Hutchinson
Pro se
Dixon Correctional Institute
P.O. Box 788 Unit-2 Dorm-6
Jackson, LA 70748-0788

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

Harlow Hutchinson (Defendant) enlisted the help of his long-time friend, Troy Landry (Landry), to kill his wife, Jennifer Hutchinson (Jennifer). Because Landry did not follow through on the plan but, instead, alerted law enforcement authorities, no harm came to Jennifer. On December 9, 2015, Defendant was charged by bill of information with one count of solicitation for murder, a violation of La.R.S. 14:28.1. On January 24, 2018, a jury found Defendant guilty of soliciting the murder of his wife.

On February 8, 2018, Defendant was sentenced to seventeen years at hard labor. Defendant appeals his conviction and sentence alleging four assignments of error presented by his appellate counsel: 1) there was insufficient evidence to support Defendant's conviction, (2) the trial court erred in denying a motion to reconsider sentence, (3) trial counsel was ineffective for failing to request a mistrial at a different point of trial, and (4) Defendant's sentence is constitutionally excessive. Additionally, Defendant alleges nine pro se assignments of error, some of which present duplicative arguments.

Lieutenant David Hardy (Hardy), a twenty-eight-year veteran of the Abbeville Police Department, testified he and Defendant went to school together and their children attended school together. Hardy stated he received an anonymous call on October 3, 2015, from someone who claimed "a friend" wanted him to murder his wife. On October 7, 2015, Hardy received another call from the same individual and this time the two agreed to meet in Abbeville at a public park. He was accompanied by Sergeant Ryan Boutte (Boutte) also with the Abbeville Police Department. Hardy recognized Landry and introduced him to Boutte. He and Boutte engaged in an extensive conversation with Landry which was recorded by Hardy's body camera. Hardy asked Landry to identify the "friend" who wanted to kill his wife but Landry

responded he wanted to speak first. He explained that he had been friends with this person since they were seven years old and that he was in the friend's wedding more than twenty years prior. He asked if there was any way to give his friend a chance to back out of his plan. Landry then presented a recorded conversation with Defendant. He explained to the officers that he only had about an hour of sleep the night before the recording and for the first time in eight years he drank alcohol before speaking with Defendant. The officers had problems hearing the video, so they plugged Landry's phone into the officer's radio. After listening to the recording, Landry told the officers his friend had previously discussed using chloroform on his wife. He further stated Defendant told him that the reason he wanted to "get rid" of his wife was "some Russian girl [he met] online." Landry explained that Defendant was coming by to see him two or three times a week to discuss his plan to have Landry kill his wife. Eventually, Landry discloses to Hardy the identity of his "friend" as Defendant.

Landry explained he was initially approached by Defendant six months earlier, but he convinced him to turn away from his plan. But, according to Landry, Defendant repeatedly discussed the plan and insisted he wanted to follow through. Hardy told Landry he would contact the State Police and get back in touch with him. He also informed Landry that Defendant would have to pay something up-front to show intent. Landry suggested the idea of telling Defendant he could not kill Jennifer, but he knew someone who would. Hardy told Landry to continue playing along and record whatever conversations he could with Defendant. Landry asked Hardy if he was in any trouble. Hardy assured him he was not because he was doing the right thing.

2

Landry later emailed Hardy a copy of the recorded conversation between he and Defendant. After receiving the email from Landry, Hardy testified he contacted Sergeant Brad Guidroz (Guidroz) with the Louisiana State Police. Hardy stated Landry asserted the cellphone video of his conversation with Defendant occurred a few days before he contacted law enforcement. The cellphone video was played for the jury.

The recorded conversation between Landry and Defendant begins with them discussing that Landry is too old to be drinking heavily and then they discuss trees growing near Landry's house. Landry next acknowledges that Defendant wanted him to shoot his wife with a crossbow and then injure him. Defendant signifies his agreement. Next, they debate where Landry should shoot Defendant, with Defendant stating "[a]fter you shoot her and I know she's, like, ninety percent dead, then I can f*****g walk up to you and then let you, from me to you, let you put one in my g*****n shoulder." The two men then debate the benefits and disadvantages of using a crossbow versus a longbow. They also discuss, in detail, how to make the scene look more believable regarding Defendant's injury after his wife is lying on the ground. Defendant suggests the easiest solution would be to find a cheap crossbow at a flea market. Landry suggests they might be able to get one in Lafayette, and Defendant responds "[f]ine, let's go there this weekend."

Hardy testified that after he called the Louisiana State Police, they took charge of the investigation under the leadership of investigator Paul Perry (Perry), a thirty-six-year veteran officer and investigator for roughly twelve of those years. The Abbeville Police Department assisted in the ongoing investigation. Hardy further testified that on the day of Defendant's arrest Boutte downloaded Landry's cellphone which contained numerous text messages between Landry and Defendant.

3

On cross-examination, Hardy testified Landry claimed his conversations with Defendant were ongoing for about six months, but he did not mention it to anyone other than his wife. He also acknowledged he never alerted Jennifer to the fact that the authorities suspected her husband was trying to have her killed.

Boutte, a law enforcement officer for sixteen years, with eight of those years spent as a detective, "process[ed]" Landry's phone, which involved creating images of the text messages, photographs, etc. stored on the phone. He reviewed a few text messages exchanged between Defendant and Landry on the same day that Landry met with he and Hardy. These included a discussion of Landry looking for a crossbow and sending a Craigslist.com advertisement for a crossbow located in Jeanerette. Defendant expresses in the texts that he was unsure the crossbow would be strong enough.

At 10:06 a.m. on October 9, 2015, Landry texted Defendant that his friend in "general rent"[1] had another buyer with cash in hand and gave Landry until noon to "give him the money." At 10:11 a.m. Defendant responded "[y]es I'm getting there. Just moving slow. My back and neck are killing me."

On cross-examination, Boutte indicated the meeting with Landry occurred at Comeaux Park, not Godchaux Park as Hardy stated. He also acknowledged that none of the text messages explicitly talks about killing anyone.

Perry noted that the investigation team "wanted to come up with something to further this," and that Hardy had pulled up the Craigslist advertisement for the crossbow. Perry explained they had Landry send the link to Defendant suggesting the need to discuss the matter in person. He also noted Defendant and Landry discussed using a crossbow as a murder weapon before law enforcement began the

---

[1] The text reference to "general rent" is apparently a phone autocorrection for "Jeanerette" which is where the individual selling the crossbow was located according to State's Exhibit 7.

4

investigation. Perry further explained the meaning of Defendant's text message that the crossbow would "easily take a rabbit or squirrel[.]" He testified Landry informed the investigators that "rabbit or squirrel" was a reference to Jennifer Hutchinson. Perry further explained the investigative team scheduled a meeting between Defendant and Landry on October 7, 2015, to discuss the murder for hire. That meeting was video-recorded. Perry explained that the investigation team had a surveillance van parked across from Landry's house and that Guidroz took photographs during the meeting. Landry asked Defendant if he still wanted Landry to kill Jennifer because "it's getting close." Defendant told Landry to turn off his phone, then it is silent for a while. Defendant admonished Landry for sending the link of the crossbow to him, stating "[t]hey can trace that." Landry then asked "[w]hen do you want to do this," to which Defendant responded "soon." Defendant stated he had changed his mind about the plan suggesting instead that they should go back to the original plan with him being at the gym when the shooting happens, so it would just look like a robbery. When Landry asked Defendant where he would hide money for Landry to disappear, Defendant told him he would hide $500 in a shoe on the steps by the door so that Landry did not have to take a chance with Defendant's dog Bella, which Landry notes is a 180-pound dog. In response to Landry asking what he should use to clean the arrow after the shooting, Defendant tells him to use "acetone, rubbing alcohol, I don't care." Defendant next tells Landry to change the head of the arrow to a regular tip, not a "big, square tip."

Landry then turned the conversation to how Defendant would "take care of" him after the job. Defendant told Landry he would deposit enough money in an account in Defendant's name to pay off Landry's home mortgage. Landry would be allowed to withdraw money from that account in smaller increments because a large mortgage payoff in a lump sum might arouse suspicion.

5

The two then discussed Jennifer's routine of returning from church around 8:30 p.m., and thus Landry could hide and ambush her while it was dark. Landry asked what he should do if the crossbow did not kill her on the first shot. Defendant responded "[y]ou know the heart is here, hit her under her left t*t." Defendant told Landry to make sure he was wearing gloves he would provide. He also told him to recover the arrow and place it in a plastic bag to avoid getting Landry's DNA, his dog's hair, or anything else on the arrow that could be traced back to Landry. They returned to discussing the purchase of the crossbow. Defendant again asked how much the crossbow would cost and Landry replied "[y]ou gave me $140, so you're looking at about another $150 for the crossbow." Landry noted that "tomorrow is Thursday, I think the guy's willing to hold it until Friday." Defendant then answers a phone call and engages in a discussion about purchasing a part for his Jeep.

Defendant next tells Landry he would funnel $550 a month to him to pay his house note for six-to-eight months, then he would pay off the mortgage in cash. Landry told Defendant he needed to know when Defendant wanted the attack to occur because he could visit a friend near Kirbyville, Texas to establish an alibi. When Landry noted that he was unsure whether Defendant wanted to wait another month for Landry to be able to use a doctor's visit as an alibi, Defendant responded "no" because he "was ready to f*****g strangle her myself, now." At the twenty-minute mark on the tape Defendant states "[y]ou know, they define stress as the dire need to choke the living s**t out of some a**hole who desperately deserves it," and "I'm fighting stress f*****g drastically."

Defendant told Landry he wanted to make sure Landry had a rock-solid alibi to insure "no heat comes back to [him]." He asked Landry if his friend would say that he was with him a couple of hours before he actually arrived. Landry responded that he would lead his friend to believe he would be covering for him while he was

6

having an affair. Landry explained to Defendant that he needed time to prepare himself because he could not just wake up and say "I'm gonna go kill Jennifer." Defendant responded, "tomorrow is too f*****g early, so next Thursday?" Landry then told Defendant he needed another $150 to get the crossbow, and if he could get the crossbow, he could do the deed the following Thursday.

The two men next discussed living on the yacht Defendant planned to buy after collecting his wife's life insurance money. Defendant stated he was tired of living the way he was living and tired of his bills. He then asked Landry what other bills he needed to pay. When Landry commented that "the heat" should not come onto him if they planned it correctly, Defendant responded "then let's finish the planning." Defendant describes how he wants to wait a day or two to buy the crossbow so that he can use cash funds from a tenant to pay for the crossbow rather than taking money out of his account. Landry reaffirms he only needed $150 more to buy the bow. Defendant then states he wanted his wife out of the way because he was hoping to take money from selling land to go to the Ukraine to meet a woman with whom he had been communicating on the internet. Defendant specifically states he did not want to wait to get this woman, noting that if he filed for divorce, he would have to wait six months to be able "to move on." Defendant then shows Landry pictures of the yacht he was planning to buy, and notes that Jennifer's life insurance would provide him with $100,000 needed for a down-payment. He also ruminates that he could afford the monthly note because his other bills would be paid off. According to Perry, after the recorded meeting on October 7, 2015, they decided to have Landry meet with Defendant on video again on October 9, 2015. He obtained an arrest warrant for Defendant on October 9, 2015. Perry noted that a local judge signed the arrest warrant granting law enforcement the right "to arrest [Defendant] at any time [they saw] fit." He also obtained a search warrant for

7

Defendant's home on the same date. Perry testified that on October 9, 2015, officers with the Abbeville Police Department and the Louisiana State Police observed Defendant leave his house, go to the bank, and then meet Landry at Landry's home. Perry was at Landry's home during this entire time, so he did not personally observe Defendant's trip to the bank. Perry stated that, once again, Defendant's meeting with Landry was recorded, and the recording was played for the jury.

The video portion of the recording is unhelpful because the camera is pointed toward the ground during the conversation. However, Defendant can be heard telling Landry if law enforcement learns that he paid for the crossbow, their story is they are buying it to hunt "rabbits and squirrels." Landry asks if Defendant would like to see the crossbow after he purchased it. Defendant states he could look at it, but he would not touch it. Defendant further provided Landry with an excuse concerning two arrows being unaccounted for in the event law enforcement inquired as to why he bought a crossbow with four arrows but has fewer afterwards. Defendant also reiterated Landry should do the job on the upcoming Thursday because Defendant's wife goes to church on Thursdays. After confirming with law enforcement that Defendant left, Landry returned the recording equipment to law enforcement.

Perry recovered the recording equipment and the $150 Defendant gave Landry while officers with the Abbeville Police Department arrested Defendant on his way back home. Perry testified he and Anthony Pardo (Pardo), another investigator with the Louisiana State Police, spoke to Defendant after he was arrested. After being advised of his constitutional rights, Defendant invoked his Fifth Amendment privilege against self-incrimination and refused to answer any questions.

8

Perry testified Defendant, after being arrested, requested a towing company be called to remove his vehicle. The police inventoried Defendant's truck prior to the towing company hauling it away. During the inventory, Perry found a Capital One bank receipt from that morning showing Defendant deposited a $1,400 check and removed $150 cash, for a total deposit of $1,250.

Perry testified he first met Jennifer a week after the authorities arrested Defendant. She was at the bank when Perry served a subpoena duces tecum seeking records of Defendant's bank account. Perry stated law enforcement also discovered a $30,000 loan applied for by Defendant. Jennifer understood the loan was for repairs to their rental properties. She provided Perry with a copy of the loan book for the $30,000 loan, which contained a note written by Defendant stating: "Rental units, pay off October 2015--2015." Jennifer told Perry there was no way they could have paid off the loan that quickly. Perry testified in addition to the $500,000 life insurance policy covering both Defendant and his wife, there was also an additional $100,000 policy on Jennifer payable as a lump sum to Defendant.

On cross-examination, Perry confirmed that prior to the recorded conversations on October 7 and October 9, 2015, law enforcement spoke with Landry and told him he needed to continue the dialog from his initial recorded conversation with Defendant before he contacted Hardy. Perry testified he was convinced law enforcement had a strong enough case against Defendant prior to the October 9, 2015 conversation, and that they would have arrested Defendant even if he had not provided the $150 cash to purchase the crossbow. He further testified that a Mac computer and an external hard drive were recovered from Defendant's home, but neither those nor Defendant's cellular phone contained any evidence indicating he planned to have his wife murdered.

9

Guidroz, a detective and investigation supervisor with the Louisiana State Police since 2010, testified he took photographs during the October 7, 2015 meeting between Defendant and Landry at Landry's home. He further testified he and another Louisiana State Police investigator, Katie Morell (Morrell), met with Jennifer shortly after Defendant's arrest on October 9, 2015, and informed her of Defendant's arrest and the plot to kill her. On cross-examination, Guidroz testified Defendant's participation in the plan to murder his wife included giving Landry the $150 for the crossbow and participating in the various planning conversations. On re-direct examination he verified that none of the conversation Landry recorded on his phone, prior to contacting law enforcement, was instigated or directed by law enforcement.

Landry testified he and Defendant were longtime friends, since they were small children, and Defendant and Jennifer were the godparents of his youngest son. He was best man at the couple's wedding. Nevertheless, Defendant first asked Landry to confirm their close friendship and then told him he was considering having Jennifer killed because of a "Russian bride" and a desire to not lose his property in a divorce. Landry stated he told Defendant it was a dumb idea, but Defendant kept bringing it up for months, after which time he decided to contact Hardy to report that Defendant kept talking to him about killing Jennifer. Landry stated Defendant discussed his desire to kill Jennifer in detail a few times but sometimes he spoke only in generalities. He testified it was Defendant's idea to kill Jennifer with a crossbow when she returned from church, at night, so that it would not make too much noise and alert the neighbors because Defendant's family lived nearby. He further stated he realized Defendant was serious after he kept talking about killing Jennifer for months. Eventually, he feared for Jennifer's safety. Landry testified he never intended to kill Jennifer, nor he did he want Defendant to have Jennifer

10

killed. In his testimony Landry reiterated he did not initially take Defendant seriously.

On cross-examination, Landry claimed he agreed to do the recordings after his initial conversation with Hardy because law enforcement told him he could either help, or go home and hope nothing happened to Jennifer, but they would come after him as an accessory if something happened.

Jennifer testified she met Defendant when she was fifteen, and at the time of Defendant's arrest they had been married for almost twenty-five years. They have two adult children. She stated she considered divorce when she was thirty because Defendant was loud and vulgar, and although she was never afraid of him, Jennifer testified that during their marriage she "hurt quite a bit." She stated she and Defendant engaged in arguments and shouting matches. She explained that Defendant was disabled but she worked full-time. He controlled their bank accounts and Jennifer was "encouraged not to spend money." She felt she had to take care of herself and him, and any request for him to help her around the house "might start something." As a licensed practical nurse, Jennifer administered weekly testosterone shots to Defendant per his doctor's instructions.

Jennifer testified she and Defendant secured a loan in March of 2015 for $30,000 to replace the roofs on their rental properties, but she had no idea why the payment book had a note that read "[p]ay off October 2015." She maintained there was no way they could pay the loan off that quickly. Jennifer explained that although she and Defendant knew Landry for a long period of time and were friends when their children were young, she did not have a high opinion of Landry. She was surprised when Defendant and Landry began talking frequently, but she encouraged it because Defendant "didn't have any other friendships, true friendships I mean. He knew a lot of people, but not friendships."

11

Jennifer explained that on the Wednesday before Defendant was arrested, she gave blood at work and that night she had to lie down on the bathroom floor to avoid passing out. Defendant was also in the bathroom, but he never checked on her or even asked if she was alright. She further testified that, although Defendant never threatened her life, he had a running joke that she was worth more dead than alive, referring to their large life insurance policies. She was not surprised when law enforcement told her what happened and had no problem believing Defendant would try to have her killed, stating: "[T]he animosity that he exhibited towards other people who he thought had done him wrong, if he for some reason felt that he needed me out of the way so he could have the life he wanted, I don't doubt he would have a problem with that." Jennifer also testified that in 2002, Defendant was arrested for simple battery when he hit Jennifer's father.

Defendant took the stand on his own behalf. He asserted he knew Landry since eighth grade, not from the age of six or seven. He maintained he did not associate with Landry because Landry was selling his own prescription drugs. Defendant alleged Landry threatened to "make [him] pay" for not offering to help him get a job and claimed that Landry initiated the idea of killing Jennifer. He asserted it was Landry's idea to kill his wife not his idea. Defendant claimed he had a friend in law enforcement that he was going to have catch Landry trying to kill Jennifer. He also alleged he had been talking to someone in Ukraine, but that everything he said about bringing her over was "strictly bull***t" which was said as part of playing along with Landry's scheme.

Defendant maintained he gave Landry $150 because they had talked about going camping in Pollock, Louisiana. He testified that after he and Jennifer attended marriage counseling in Lafayette in 2001, "the next ten or twelve years [their marriage] was outstanding from there." He further commented that "three or four

12

times a week having sex, I thought our marriage was going fairly well after 24-1/2 years." He did, however, agree with Jennifer's description of his behavior, noting "I'm an a\*\*hole." Defendant asserted that when Jennifer was giving him testosterone, he was having rage incidents that he does not remember. He repeatedly claimed the entire scheme to murder his wife was Landry's idea and that he was just playing along. He asserted his references to stress during the recorded conversations was just him repeating Landry's words back to him and again insinuated that Landry, not he, wanted to kill Jennifer for the insurance money. Nevertheless, Defendant acknowledged he paid for half the cost of the murder weapon. On cross-examination Defendant repeatedly claimed that everything he said and did in the videos was his attempt at playing along with Landry's idea of murdering his wife for her life insurance proceeds.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one such error.

The record before this court fails to indicate the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Therefore, we hereby direct the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record demonstrating Defendant received such notice. *See State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

**ASSIGNMENT OF ERROR NO. 1**

In his first counseled assignment of error, Defendant contends the evidence was insufficient to support his conviction for solicitation for murder. Additionally, he claims "the State is guilty of entrapment."

The analysis for a sufficiency claim is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Under La.R.S. 14:28.1(A), solicitation for murder is defined as "the intentional solicitation by one person of another to commit or cause to be committed a first or second degree murder." Solicitation is relevantly defined as "[t]he criminal offense of urging, advising, commanding, or otherwise inciting another to commit a crime." BLACK'S LAW DICTIONARY (10th ed. 2014). The trial court gave the following correct instruction on solicitation for murder to the jury: "Thus, in order to convict the defendant of solicitation of murder you must find, one, that the defendant solicited Troy Landry to commit first or second degree murder of Jennifer Hutchinson; and two, that the defendant acted with the specific intent to cause the murder of Jennifer Hutchinson."

14

In *State v. Clement*, 07-650, p. 7 (La.App. 3 Cir. 2/6/08) (unpublished opinion), *writ denied*, 08-871 (La. 11/21/08), 996 So.2d 1103, this court stated:

> Solicitation for murder consists of the solicitor purposely seeking to have someone killed and trying to engage someone to do the killing. The solicitation is complete when the solicitation is made. Any contingency in the plan, such as the payment of money, may affect whether the victim is killed, but does not change the solicitor's original intent that the victim be murdered. *See People v. Sexton*, 250 Mich.App. 211, 646 N.W.2d 875 (2002), *appeal denied*, 467 Mich. 949, 656 N.W.2d 531 (2003).

We find Defendant's insufficient evidence claim lacks merit. As detailed above, Defendant's own words during multiple recorded statements make it clear that Defendant was asking his friend, Troy Landry, to murder his wife in exchange for a portion of the life insurance money Defendant would receive when his wife died. He provided a plan that created alibis for both himself and Landry. He instructed Landry on when, where, and how to kill Jennifer, and he specifically outlined why he wanted her dead rather than simply divorcing her.

Defendant's trial counsel attempted to argue that law enforcement committed entrapment against him, and that he had no intent to have his wife killed prior to the involvement of the Louisiana State Police. Additionally, Defendant argues entrapment again in his pro se brief to this court under his sufficiency claim. As this court noted in *State v. Caldwell*, 616 So.2d 713, 719 (La.App. 3 Cir.), *writ granted in part on other grounds*, 620 So.2d 859 (La.1993):

> Entrapment is a defense which arises when a law enforcement official or an undercover agent, acting in cooperation with such an official for the purpose of obtaining evidence of a crime, originates the idea of the crime and then induces another person to engage in conduct constituting the crime, when the other person is not otherwise disposed to do so.

We find this argument lacks merit as well. It is uncontested that, prior to October 7, 2015, no law enforcement agencies were involved in this case. It is also uncontested that the recorded conversation between Defendant and Landry, entered

15

into evidence as State's Exhibit 2, occurred about a week prior to the involvement of law enforcement. In that video alone: 1) Defendant clearly agrees he wants Landry to kill Jennifer; 2) he suggests Landry should shoot him after they are sure Jennifer is going to die so it looks like Defendant was trying to defend her; and 3) after Landry suggested they should perhaps use an actual bow, Defendant insists the best idea would be to kill Jennifer with a cheap crossbow which could be purchased without a paper trail. Reviewing the evidence, under the *Jackson* standard, in the light most favorable to the prosecution, we find the recorded conversation between Landry and Defendant, which occurred before law enforcement became involved, sufficiently proves Defendant wanted Jennifer dead and that he solicited Landry to do the killing.

We also reject Defendant's argument urged at trial and in this appeal averring that all he did was give Landry $150. First, the argument assumes that solicitation for murder, like attempt or conspiracy, requires an "affirmative action" in furtherance of some plot. As this court stated in *Clement*, the criminal act here is that Defendant wanted Jennifer dead and he asked someone, namely Landry, to kill her. Furthermore, Defendant's allegation that he gave Landry $150 for a camping trip is directly contradicted by video evidence presented to the jury. Indeed, Defendant's entire argument on appeal ignores the fact that there were multiple recorded conversations in which Defendant explicitly states he wants Jennifer dead, he wants Landry to kill her, he suggests two possible alibis for himself, helps Landry firm up his own alibi, and details the specifics of how he plans to pay Landry more than $30,000 over a specified period of time for killing Jennifer.

Additionally, we note Defendant's claim that "there was no evidence on [his] computer or cell phone indicating he wanted to kill his wife and marry a Russian bride" ignores the fact that the jury heard evidence from which they could reasonably

16

conclude that Defendant explicitly wanted Jennifer dead because he wanted to bring a woman over from Ukraine and did not want to have to wait six months for a divorce to be made final.

Although not titled an assignment of error, Defendant attempts to add to his counsel's claim of entrapment in his pro se "Issue for Review I." Although Defendant claims the Abbeville Police Department and the Louisiana State Police "had to entrap the defendant to move this thing forward and induce the defendant to make an overt act[,]" this assertion adds nothing to his counsel's assignment of error. As already noted, Defendant's crime was asking Landry to kill Jennifer, which he did in the initial video prior to the involvement of law enforcement.

In the end, the jury was presented with two possibilities: 1) Defendant's claim that he was afraid Landry was going to kill Jennifer for the insurance money Defendant would get unless Defendant played along, or 2) that multiple recorded conversations clearly showed Defendant intended to have his wife killed and pay Landry to kill her. Based upon our review of the record we find that "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Accordingly, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 2; PRO SE ASSIGNMENTS NOS. 4 & 6**

In his second assignment of error and in pro se assignments numbers four and six, Defendant contends the trial court erred in denying his motion for mistrial based on Jennifer's testimony. During the State's re-direct examination of Jennifer, the State asked if "[l]ooking back now -- which you haven't been with Harlow for two years -- would you put up with the way he treated you now?" Jennifer's response involved a statement that Defendant's insistence on a certain sexual position shortly after she had back surgery necessitated her having a second back surgery. She then

17

stated: "I feared many times from his violent behavior. I mean, just looking back on things, you know, road rage. One time chasing somebody off of the interstate and stopping them in a parking lot --." At that point, defense counsel requested a sidebar outside the hearing of the jury and requested a mistrial based on introduction of other crimes evidence. Ultimately, the trial court denied the motion for mistrial and admonished the jury to disregard Jennifer's testimony about Defendant trying to run someone off the road. None of the jurors indicated they had any problem doing so.

Defendant argues that under La.Code Crim.P. art. 770(2), Jennifer's comment would have entitled him to a mistrial as a reference to inadmissible hearsay if the comment had been made by the trial judge, the district attorney, or a court official. However, Defendant acknowledges the comment is not covered by La.Code Crim.P. art. 770, but rather by La.Code Crim.P. art. 771. Under La.Code Crim.P. art. 771, the trial court is required to admonish the jury to disregard remarks that are "irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury[.]" Article 771 further states that "on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial." The trial court did not believe Jennifer's unsolicited remark required a mistrial; the judge offered to admonish the jury and did so at defense counsel's request.

Defendant, despite acknowledging the trial court had authority to admonish the jury rather than grant an automatic mistrial, argues he was denied a fair trial because "[t]he erroneous admission of this other crimes evidence could only have inflamed the passions of the jury." He presents no support for the proposition that the admonishment was insufficient, other than to make a conclusory statement that he clearly looked like a bad person and therefore did not receive a fair trial. "Unsolicited, spontaneous answers, statements, and language of a witness not

18

necessarily responsive to the question are not usually grounds for a mistrial." *State v. Callihan*, 242 So.2d 521, 525 (La.1970). Furthermore, as noted by the Louisiana Fifth Circuit Court of Appeal in *State v. Wall*, 14-539, p. 13 (La.App. 5 Cir. 12/23/14), 209 So.3d 962, 971: "A mistrial should be granted under [La.Code Crim.P. art.] 771 only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial." The *Wall* court further recognized that:

> A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to a defendant that deprives him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion.

*Id.* at 971-72.

We find, under the provisions of La.Code Crim.P. art. 771, Defendant fails to show the trial court abused its discretion in denying his motion for mistrial. Accordingly, these assignments of error lack merit.

**ASSIGNMENT OF ERROR NO. 3**

In his third assignment of error, Defendant argues trial counsel was ineffective for failing to request a mistrial when Guidroz stated he believed Defendant intended to kill Jennifer. During the State's redirect examination, the following exchange occurred:

Q. Did you believe Harlow Hutchinson intended to kill his wife?

A. Yes.

MR. GUIDRY: Objection.

THE COURT: Don't answer, please. Sustained. And I'm not sure -- did you answer that?

THE WITNESS:

A. Yes.

19

THE COURT: All right. The jury is to please disregard that. He cannot give an opinion as to that. That was not proper. Please disregard it. Can anybody not disregard that?

(ALL JURORS INDICATE NO.)

THE COURT: All right. Thank you. Continue.

Defendant makes the conclusory claim that an admonishment under La.Code Crim.P. art. 771 was insufficient and that defense counsel's failure to request a mistrial "can only be considered ineffective [assistance]." Although claims of ineffective assistance of counsel are typically relegated to post-conviction relief, the supreme court has stated that "[w]here the record, however, contains evidence sufficient to decide the issue, and the issue is raised on appeal by an assignment of error, the issue may be considered in the interest of judicial economy." *State v. Leger*, 05-11, p. 44 (La. 7/10/06), 936 So.2d 108, 142, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007). We find the record here is sufficient to address Defendant's claim.

In order to prevail on his ineffective assistance claims Defendant must satisfy a two-part test. First, he must show counsel's performance was deficient; next, he must show the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). Failure to prove prejudice renders the question of deficient performance moot, we will therefore address only the prejudice portion of the *Strickland* test. In order to show prejudice, Defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Had defense counsel requested a mistrial, this court's review would be identical to the review of Defendant's second counseled assignment of error. As we have

20

previously noted, Defendant would be entitled to an automatic mistrial if Guidroz's comment falls under the provisions of La.Code Crim.P. art. 770(2), but, "[a] police officer is not a court official within the meaning of [La.Code Crim.P.] Article 770." *State v. Watson*, 449 So.2d 1321, 1328 (La.1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 939 (1985). As we also noted earlier herein the proper action for the trial court was to admonish the jury. The trial court did so and concluded a mistrial was not required. Defendant presents no evidence indicating the trial court abused its discretion in making such a finding. Because Defendant has not proven "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,]" he has failed to prove prejudice; therefore, his claim of ineffective assistance of counsel lacks merit. *Strickland*, 466 U.S. at 694.

**ASSIGNMENT OF ERROR NO. 4**

In his final counseled assignment of error, Defendant contends his sentence is constitutionally excessive, asking this court to review his sentence "as a bare claim of constitutional excessiveness." Defendant appears to recognize that under La.Code Crim.P. art. 881.1(E), his failure to make or file a motion to reconsider sentence prohibits him from raising grounds to reconsider on appeal. Nevertheless, this court has reviewed claims of excessiveness where no objection was made and no motion to reconsider sentence filed. *See State v. Johnlouis*, 09-235 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, 562 U.S. 1150, 131 S.Ct. 932 (2011); *State v. Thomas*, 08-1358 (La.App. 3 Cir. 5/6/09), 18 So.3d 127; *State v. Perry*, 08-1304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, *writ denied*, 09-1955 (La. 6/25/10), 38 So.3d 352; *State v. H.J.L.*, 08-823 (La.App. 3 Cir. 12/10/08), 999 So.2d 338, *writ denied*, 09-606 (La. 12/18/09), 23

21

So.3d 936; *State v. Quinn*, 09-1382 (La.App. 3 Cir. 5/12/10), 38 So.3d 1102, *writ denied*, 10-1355 (La. 1/7/11), 52 So.3d 885.

Under La.R.S. 14:28.1(B), "[w]hoever commits the crime of solicitation for murder shall be imprisoned at hard labor for not less than five years nor more than twenty years." Defendant was sentenced to seventeen years at hard labor.

Louisiana courts have laid out the following guidelines with regard to excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
>> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
>
> Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958[, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996)].

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

In *State v. Baker*, 06-1218 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, *writ denied*, 07-320 (La. 11/9/07), 967 So.2d 496, *and writ denied*, 07-1116 (La. 12/7/07), 969 So.2d 626, this court adopted the fifth circuit's three factor test enunciated in *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183, which established that an appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes.

With regard to the nature of the crime, we note, as did the trial judge, that while the actual crime committed, solicitation for murder, did not cause harm to the victim, had Defendant not sought to hire someone willing to go to law enforcement, the result would have been much worse. Defendant sought to have his childhood friend murder his wife of nearly twenty-five years. The point is made more egregious considering Defendant's reasons stated in his own words during the October 7, 2015 recording. These reasons included wanting to bring a woman over from Ukraine and wanting to purchase a yacht, neither of which would have been possible if he merely divorced his wife. Instead, he wanted her murdered because that had the added benefit of earning him roughly half-a-million dollars enabling him to accomplish his goals.

23

With regard to the nature of the offender, Defendant was forty-five years old when he was arrested. He is disabled and has two adult children with his intended victim. His only prior conviction is a misdemeanor conviction for battery, which Jennifer testified was committed against Defendant's father-in-law. Jennifer also testified Defendant had a temper and was often verbally abusive to her.

Defendant cites multiple cases in support of his argument that the sentence is out of proportion given his status as a first-felony offender. In *Clement*, the defendant was sentenced to ten years at hard labor as a first-felony offender after attempting to hire someone to murder a woman who had filed a medical malpractice lawsuit against the defendant's husband.

In *State v. Bennett*, 617 So.2d 550 (La.App. 3 Cir. 1993), the defendant was sentenced to five years at hard labor after attempting to hire a hit-man to murder a witness who was set to testify against the defendant in an ongoing criminal trial.

Defendant cites *State v. Nomey*, 613 So.2d 157 (La.1993), a case in which the defendant pled guilty to two counts of solicitation for murder in addition to one count of first-degree murder. There the defendant was sentenced to ten years at hard labor on each count of solicitation for murder. We find Defendant's reliance on *Nomey* is misplaced given the fact that the supreme court vacated the defendant's conviction and remanded the matter for completion of a sanity commission which was ongoing when the defendant pled guilty.

Finally, Defendant cites *State v. Blow*, 45,415 (La.App. 2 Cir. 8/11/10), 46 So.3d 735, *writ denied*, 10-2093 (La. 2/11/11), 56 So.3d 1000, wherein the defendant was convicted of two counts of solicitation of murder on the basis of contacting two separate male acquaintances and asking them to murder her husband. The *Blow* court found that concurrent fifteen-year sentences on each count were not excessive, noting "[t]he sentences cannot be considered to be grossly disproportionate to these

24

cold crimes. The trial court did not abuse its sentencing authority in imposing these sentences." *Id.*, 46 So.3d at 751.

In *State v. Falcon*, 06-798 (La.App. 5 Cir. 3/13/07), 956 So.2d 650, the fifth circuit found a seventeen-year sentence for a first-felony offender who attempted to have someone he met while in jail for violating a restraining order murder his ex-wife of twenty years was not constitutionally excessive. The *Falcon* court specifically noted:

> The trial judge is afforded wide discretion in determining a sentence and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed, even when the trial judge does not provide reasons for the sentence. *State v. Polizzi*, 05-478, p. 16 (La.App. 5th Cir.2/14/06), 924 So.2d 303, 313, *writ den.* 06-1052 (La.11/3/06), 940 So.2d 660. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. *Polizzi,* 05-478 at p. 17, 924 So.2d at 314.
>
> In this case, the record reflects in chilling detail the Defendant's actions in hiring what he believed to be a hit-man to murder Ms. Falcon, his former wife of 20 years and the mother of his children. Thus, we find that the record supports the sentence imposed.

*Id.* at 659.

Although the *Falcon* court ultimately remanded for consideration of post-trial motions, the court specifically held the defendant's seventeen-year sentence was not excessive.

Defendant contends his crime was not as egregious as the cases he mentions and therefore his sentence should be considered constitutionally excessive. We disagree. We find Defendant's conviction is more similar to *Falcon*. Defendant attempted to have a longtime friend murder his wife of over twenty years so that he could collect her life insurance proceeds, avoid a divorce, use the proceeds to buy a yacht and pay off bills enabling him to be debt free and marry an internet acquaintance from Ukraine . Furthermore, the trial court listened to statements from

both Defendant and Jennifer at sentencing with Defendant asking for the lightest sentence possible and Jennifer asking for a maximum sentence. In sentencing Defendant, the trial court stated the following (emphasis added):

> All right. Mr. Hutchinson, the law does not allow me to suspend any part of your sentence in a case such as this, solicitation for murder. That's too bad because I would like to be able to give you something -- some part of your sentence suspended so I can have you on probation and you could be watched.
>
> **The plan that you concocted was a particularly egregious plan. Just the thought of it being carried out is disheartening, to say the least.**
>
> **The prosecutor was right. I saw no remorse from you whatsoever. During the trial, the only remorse, if you want to call it that, is you said, "I apologize for it now." That didn't make much of an impression on me.**
>
> **I fear reprisal for the people that testified against you because of the plan that you concocted against your wife.** So I'm going to sentence you -- I'm not going to sentence you to twenty years at hard labor, as asked by the prosecutor because I believe if I do that, since you only have a misdemeanor on your record, it will probably be sent back to me for resentencing for an unduly harsh sentence.
>
> Therefore, I'm going to sentence you to what I think will stick. I am going to sentence you to seventeen years at hard labor.
>
> **You said there was no loss of life. And the reason there was no loss of life was, fortunately, the person you tried to get to do the job went to the police. Otherwise, there would be a loss of life.**

We note that Defendant, in his pro se "Issue for Review III," contends the trial court was prejudiced based solely on the trial court's statement at sentencing that it did not think this court would affirm a maximum sentence, thus he was sentenced to seventeen-years instead. As noted, no objection was made to Defendant's sentence. Furthermore, Defendant's argument is that he "feel[s] that the language portrayed is quite prejudiced." But Defendant's conclusory statement is not a valid legal argument and it is meritless.

26

Although on the high end of the sentencing range, the record is clear that Defendant attempted to have his childhood friend murder his wife of over twenty years, so he could collect her life insurance money and live a more entertaining life without her. We cannot say the trial court abused its discretion in sentencing Defendant.

**PRO SE ASSIGNMENT OF ERROR NO. 1**

In his first pro se assignment of error, Defendant contends the trial court erred in allowing the introduction of the October 7, 2015 recording. We find this assignment of error lacks merit. Under La.Code Crim.P. art. 841(A):

> An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

Defendant's assignment of error complains of the introduction of State's Exhibit 8, the recording of his conversation with Landry dated October 7, 2015. Not only was no objection made to the introduction of the exhibit at trial, defense counsel *stipulated* to its introduction. Defendant cannot complain of the introduction of the recording at this stage of the proceedings.

In addition to making the above argument, Defendant also presents "Issue for Review II," wherein he appears to complain about the introduction of all of the evidence against him based upon his claim that Perry lied to Judge Laurie Hulin in order to obtain an arrest warrant. Without a contemporaneous objection, Defendant cannot contest the admissibility of evidence presented at trial. Because Defendant does not give a single example of evidence which should have been excluded where his trial counsel objected, we find this issue lacks merit.

**PRO SE ASSIGNMENT OF ERROR NO. 2**

In his second pro se assignment of error, Defendant contends the trial court erred in denying defense counsel's motion for a mistrial when Perry was asked if he investigated anything between Defendant and Jennifer other than the $500,000 life insurance policy and he responded "I spoke with Jennifer where something came up about an accident that they were in." Defendant correctly notes that, like appellate counsel's second assignment of error, a mistrial in this instance would be governed by La.Code Crim.P. art. 771. The trial court noted that Perry simply saying he heard Defendant and Jennifer were in an accident was not prejudicial. The State acknowledged they were not trying to mention the car accident. Defense counsel did not request an admonition to the jury. As we have discussed earlier herein, under the provisions of La.Code Crim.P. art. 771, the trial court need only grant an admonition if the remark in question is of such a nature that it may create prejudice against Defendant. Furthermore, also as previously noted, the trial court has great discretion in determining whether to grant a mistrial. There is no evidence the trial court was incorrect in finding Perry's statement was not prejudicial. As such, neither an admonishment nor a mistrial was warranted. We therefore find this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NO. 3**

In his third pro se assignment of error, Defendant contends his trial counsel was ineffective for failing to request a mistrial when Landry stated: "but after another incident took place and I saw it was serious and he meant to do it, they were trying to stop him." This assignment of error, and thus any evaluation thereof, is virtually identical to counsel's third assignment of error. The primary difference is, whereas counsel's assigned error involved the answer of law enforcement to a question posed by the State, Defendant now complains that his trial counsel was ineffective for

28

failing to seek a mistrial based on a witness's answer to defense counsel's own question. The complained of statement occurred while defense counsel was attempting to build an entrapment defense and was asking whether law enforcement told Landry what to say and do during the recorded conversations with Defendant. As noted in our discussion of defense counsel's third assignment of error, ineffective assistance of counsel claims are typically relegated to post-conviction relief; however, they may be addressed on appeal where the record is sufficient. As noted above, in order for Defendant to prove prejudice under *Strickland*, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Also, as noted above, "[a] mistrial should be granted under [La.Code Crim.P. art.] 771 only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial." *Wall*, 209 So.3d at 971.

We find no evidence to support the allegation that the trial court should have granted a mistrial in the event defense counsel had requested one after Landry's testimony. There is no evidence the outcome would likely have been different thus, Defendant cannot satisfy the prejudice prong of the *Strickland* test. We therefore find this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NO. 5**

In his fifth pro se assignment of error, Defendant claims the trial court should have declared a mistrial on its own because one juror heard the case had been mentioned on the news and another juror was shocked that they mentioned the case on television, stating only the charges were mentioned. Defendant cites no support for his argument other than a quote from *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507 (1966), a case which reversed a 1950s murder conviction because the

29

trial court "did not fulfill [its] duty to protect Sheppard from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom[.]" *Id*. at 363. Unlike the case *sub judice*, where two jurors were aware that the case was mentioned on the news, *Sheppard* involved months of non-stop coverage. In that case the trial court allowed twenty television and newspaper representatives to sit directly behind counsel during the trial, cameras were allowed in and around the courtroom at all times, stories were run about individual jurors and prospective jurors including a published list of the names and addresses of the initial seventy-five potential jurors, and more. The cases are not remotely similar in terms of publicity. Furthermore, no objection was made at trial to the presence of either juror, nor was any request made that either juror be removed, or a mistrial granted. Accordingly, we find this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NO. 7**

In his seventh pro se assignment of error, Defendant argues that his trial violated La.Code Crim.P. art. 578(A)(2), which requires that a defendant be brought to trial within two years of the institution of prosecution on felonies other than murder. Defendant was arraigned on December 10, 2015 and brought to trial on January 23, 2018. In *State v. McClendon*, 17-160 (La.App. 4 Cir. 9/27/17), 228 So.3d 252, *writ denied*, 17-1836 (La. 6/1/18), 243 So.3d 571, the defendant argued the trial court failed to timely bring him to trial under La.Code Crim.P. art. 578 where the defendant's trial took place roughly five years after he was charged. The fourth circuit stated:

> However, McClendon failed to file a motion to quash seeking to challenge the untimely commencement of trial or to assert a violation of his constitutional right to a speedy trial. A motion to quash is the proper procedural vehicle for raising untimely prosecution. A defendant may also raise a claim for the denial of his constitutional right to a speedy trial by a motion to quash. Further, McClendon did not file a motion for speedy trial.

> Because he did not raise these claims before the trial court, McClendon failed to preserve for appeal any alleged violation of his right to speedy trial or claim of untimely prosecution.
>
> Accordingly, we find no merit in this assignment.

*Id.* at 266-67 (footnotes omitted).

No motion to quash was filed herein. Accordingly, we find Defendant waived these claims by failing to object prior to the commencement of trial.

**PRO SE ASSIGNMENT OF ERROR NO. 8**

In this pro se assignment of error, Defendant argues his trial counsel was ineffective because "[t]here were no pretrial motions filed on my behalf by my court appointed counsel[.]" As we have discussed previously herein, Defendant fails to prove either prong of the *Strickland* standard for ineffective assistance. He has not stated what motions he believes should have been filed nor has he stated how the filing of such motions would have changed the outcome of his case. Thus, we find this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NO. 9**

In his final pro se assignment of error, Defendant argues the trial court "should have rendered the verdict as acquittal or at least as [a] mistrial" because he was convicted by a non-unanimous jury verdict. Although defense counsel requested polling of the jury, neither the transcript nor the minutes reflect the results of said polling. Accordingly, Defendant cannot prove that he was convicted by a less than unanimous jury verdict. Furthermore, under La.Code Crim.P. art. 782 "[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict." The Supreme Court's ruling in *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628 (1972), held that a state court conviction obtained by a less than unanimous jury was

31

constitutional, and the Louisiana State Supreme Court recently upheld the constitutionality of La.Code Crim.P. art. 782 in *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738.  Therefore, even if Defendant could prove his conviction was by a less than unanimous jury the verdict is valid. This assignment of error is meritless.

## Conclusion

For the reasons stated Defendant's conviction and sentence are affirmed.  The trial court is hereby directed to inform Defendant of the provisions of La.Code Crim. P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record indicating Defendant received the notice.

**AFFIRMED WITH INSTRUCTIONS.**